# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CV-22839-MOORE/Elfenbein

**LEADER ENTERTAINMENT S.A.,**

      Plaintiff,

 v.

**CROM PRODUCTIONS, LLC**, *et al.*,

     Defendants.

_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court on Plaintiff Leader Entertainment S.A.'s ("Plaintiff")

Motion for Entry of Final Judgment After Default Against Crom Productions, LLC and Ancla

Productions, Inc. (the "Motion"), ECF No. [66].  The Honorable K. Michael Moore referred this

matter to me "to take all necessary and proper action as required by law and/or to issue a Report

and Recommendation regarding Plaintiff's Motion for Default Judgment." *See* ECF No. [67].  For

the reasons explained below, I respectfully **RECOMMEND** that the Motion, **ECF No. [66]**, be

**GRANTED.**

## I.   BACKGROUND[1]

This case involves the unauthorized use of Plaintiff's federally registered trademark La

Granja De Zenón (the "La Granja De Zenón Mark" or the "Mark") in connection with a live touring

show promoted and performed throughout the United States.   Plaintiff is an Argentinian

---

[1] Because Plaintiff has obtained an entry of default, *see* ECF No. [62], the Court accepts as true its well-pleaded factual allegations, *see TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289, 1298 (S.D. Fla. 2016), but not its conclusions of law, *see Surtain v. Hamlin Terrace Found*, 789 F.3d 1239, 1245 (11th Cir. 2015).

entertainment company that produces an online children's series on YouTube featuring original animated characters — primarily farm animals — including Bartolito, Lobo Betón, Zenón, Lorito Pepe, La Vaca Lola, and Percherón.  *See* ECF No. [25] at ¶¶8, 10.  Plaintiff has been in business for more than 40 years and holds multiple United States trademark registrations associated with its La Granja De Zenón series, including La Granja De Zenón, La Vaca Lola, and Bartolito.  *See* ECF No. [25] at ¶¶8, 17, 19.

Plaintiff began releasing its YouTube series in 2011 under the title "Las Canciones de la Granja," which was rebranded as "La Granja De Zenón" in 2016.  *See* ECF No. [25] at ¶¶9, 12. Plaintiff distributes the series through various channels, including 46 YouTube accounts and streaming platforms such as Netflix, HBO/Warner, Amazon, Flow, and Paramount/Pluto TV.  *See* ECF No. [25] at ¶14.  Additionally, Plaintiff translated its series into ten languages, including English, and has achieved recognition in both Latin American and United States markets, ranking as the number 7 content provider in the world in the "Made for Kids" category (number 1 in Spanish).  *See* ECF No. [25] at ¶¶14–15.  Moreover, Plaintiff's "El Reino Infantil" YouTube channel is currently the top-ranked content creator on YouTube in Argentina and the third largest across South America.  *See* ECF No. [25] at ¶¶14–15.

To safeguard its growing success, Plaintiff secured trademark registrations in the United States in 2016, including marks for its titles — La Granja De Zenón, La Vaca Lola, and Bartolito — as well as for its original animated characters.  *See* ECF No. [25] at ¶¶16–17, 19.  Plaintiff has continuously used these marks in commerce within the United States since 2016 and allocates hundreds of thousands of dollars each year toward advertising and promotion.  *See* ECF No. [25] at ¶¶20–21.  Based on these efforts, Plaintiff contends that the marks have developed recognition, goodwill, and secondary meaning among consumers, including in Florida and other parts of the

United States.  *See* ECF No. [25] at ¶¶21–23.

Defendants, Crom Productions, Inc. ("Crom") and Ancla Productions, Inc. ("Ancla") (collectively, the "Defendants"), are Florida limited liability companies with principal places of business in Fort Lauderdale, Florida.  *See* ECF No. [25] at ¶¶6–7.  Plaintiff asserts that Defendants are well aware of Plaintiff's series and sought to benefit from its large-scale success.  *See* ECF No. [25] at ¶24.  In late 2023, Defendants began jointly producing and promoting a live children's show titled "La Granja En Vivo."  *See* ECF No. [25] at ¶25.  Defendants presented this program as a live version of a "YouTube musical phenomenon," clearly referencing Plaintiff's popular "Granja" series.  *See* ECF No. [25] at ¶26.  Promotional materials for these shows made direct mention of Plaintiff's characters, including Bartolito, La Vaca Lola, Zenón, El Lobo Beto, and Percheron.  *See* ECF No. [25] at ¶28.  Defendants promoted and staged the live shows within the Southern District of Florida and elsewhere, in an effort to capitalize on the success associated with Plaintiff's long-established brand.  *See* ECF No. [25] at ¶24-25.

Furthermore, Crom secured a U.S. copyright registration for the "Granja" live performances by inaccurately claiming authorship of the series in its submission to the Copyright Office.  *See* ECF No. [25] at ¶29.  Shortly thereafter, in February 2024, Crom applied for an "intent to use" trademark registration for "La Granja En Vivo" in Class 41, the same class as Plaintiff's "La Granja De Zenón" registration.  *See* ECF No. [25] at ¶30.  Defendant's trademark used graphics and logos closely resembling those of "La Granja De Zenón" and "El Reino Infantil," further contributing to consumer confusion.  *See* ECF No. [25] at ¶30.  Defendants continued to display and use these characters and the "La Granja En Vivo" name without permission.  *See* ECF No. [25] at ¶28, 33.  As a result of Defendants' actions, Plaintiff alleges that Defendants' conduct has caused, and will continue to cause, consumer confusion and has resulted in irreparable harm

to its brand and reputation. *See* ECF No. [25] at ¶¶35–37.

Against this backdrop, in the Amended Complaint, Plaintiff has filed the following claims against Defendants: federal trademark infringement against Ancla and Crom under 15 U.S.C. § 1114 (Counts I and II respectively); federal false designation of origin and unfair competition against Ancla and Crom under 15 U.S.C. § 1125(a) (Counts III and IV respectively); common law trademark infringement under Florida law against Ancla and Crom (Counts V and VI respectively); common law unfair competition under Florida law against Ancla and Crom (Counts VII and VIII respectively); and refusal of Crom's U.S. trademark application No. 98409771 under 15 U.S.C. § 1052(d) (Count IX). *See* ECF No. [25].  In the Amended Complaint, Plaintiff seeks a permanent injunction, restraining Defendants from using its trademarks, and a judgment in the amount of Defendants' profits or Plaintiff's actual damages as well as its attorney's fees.  *See* ECF No. [25].

On September 19, 2024, Plaintiff filed its Amended Complaint against both Defendants. *See* ECF No. [25].  While still represented by counsel, Defendants filed Answers and Affirmative Defenses.  *See* ECF Nos. [33] and [34].  Shortly thereafter, Plaintiff scheduled depositions with both Defendants.  *See* ECF No. [66] at 2.  Before the depositions could proceed, however, defense counsel moved to withdraw their representation, which the Court granted.  *See* ECF Nos. [48], [50], [51], and [54].  Because corporations cannot represent themselves in federal court, the Court ordered Crom to retain new counsel by March 8, 2025 and Ancla by March 18, 2025.  *See* ECF Nos. [50] and [54].  Neither Defendant complied, and as a result, Plaintiff filed an Amended Motion for Entry of Default against Crom on March 13, 2025, and a Motion for Entry of Default against Ancla on March 25, 2025.  *See* ECF Nos. [57] and [61]. The Court thereafter entered a default against both Defendants given their failure to retain new counsel notwithstanding the

Court's warning that failure to do so would result in the entry of a default. *See* ECF No. [62]. The Court also struck each Defendants' respective Answer and Affirmative Defenses and directed Plaintiff to file a motion for default judgment within 20 days. *See* ECF No. [62]. Plaintiff timely filed its Motion for Final Judgment After Default against both Defendants. *See* ECF No. [66].

## II.    LEGAL STANDARDS

### A. Default Judgment Standard

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55 (a). After the clerk enters a default, the Court is authorized to enter a final default judgment if the party seeking it applies for one. *See* Fed. R. Civ. P. 55 (b)(2); *Surtain v. Hamlin Terrace Found*, 789 F.3d 1239, 1244 (11th Cir. 2015) ("When a defendant has failed to plead or defend, a district court may enter judgment by default.").

"A 'defendant, by his default, admits the plaintiff's well-pleaded allegations of fact' as set forth in the operative complaint." *TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289, 1298 (S.D. Fla. 2016) (quoting *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009)). But the defendant "is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Surtain*, 789 F.3d at 1245 (quotation marks omitted). And a defendant's default does not automatically permit the Court to enter a default judgment: "Because the defendant is not held to admit facts that are not well pleaded or to admit conclusions of law, the court must first determine whether there is a sufficient basis in the pleading for the judgment to be entered." *Chanel, Inc. v. Replicachanelbag*, 362 F. Supp. 3d 1256, 1259 (S.D. Fla. 2019); *see also Surtain*, 789 F.3d at 1245 ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered." (quotation marks omitted)).

The Eleventh Circuit has "interpreted the standard" for evaluating whether a sufficient basis for default judgment exists "as being akin to that necessary to survive a motion to dismiss for failure to state a claim." *Surtain*, 789 F.3d at 1245; *see also Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997) ("[A] default judgment cannot stand on a complaint that fails to state a claim."). Of course, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "This plausibility standard is met 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Surtain*, 789 F.3d at 1245 (quoting *Iqbal*, 556 U.S. at 678).

## B. Trademark and Unfair Competition Law

### 1. Federal Trademark Infringement (15 U.S.C. § 1114)

"Section 32 of the Lanham Act, 15 U.S.C. § 1114, provides liability for trademark infringement if, without the consent of the registrant, a defendant uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark: which is likely to cause confusion, or to cause mistake, or to deceive.'" *Chanel, Inc.*, 362 F. Supp. 3d at 1262 (quoting 15 U.S.C. § 1114). "To prevail on a trademark infringement claim under 15 U.S.C. § 1114, the plaintiff must show that it owns a valid trademark, that its mark has priority, that the defendant used such mark in commerce without the plaintiff's consent, and that the defendant's use is likely to cause consumer confusion as to the source, affiliation or sponsorship of its goods or services." *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1264–65 (S.D. Fla. 1999); *see also Chanel, Inc.*, 362 F. Supp. 3d at 1262 (consolidating those four elements into two: plaintiff "had prior rights to the mark at issue" and defendants "adopted a mark or name that was the same,

or confusingly similar to" it "such that consumers were likely to confuse the two").

Registration of a mark with the United States Patent and Trademark Office ("USPTO") is "prima facie evidence" of its "validity," "the registrant's ownership of" it, and "the registrant's exclusive right to use" it "in commerce" or "in connection with the goods or services specified in the registration." *See* 15 U.S.C. § 1115(a). A plaintiff's mark has priority if the plaintiff began using the mark before the defendant began using its competing mark. *See PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1218 (S.D. Fla. 2004) (noting that plaintiff's mark had priority because it had been selling its products for five years before defendant created the competing domain names). One way a defendant can use a mark in commerce is by "establishing a website on the Internet" that contains the mark. *See id.*

"In determining the likelihood of confusion, the court must analyze the following seven factors: (1) the type of trademark; (2) the similarity of the marks; (3) the similarity of the products the marks represent; (4) the similarity of the parties' retail outlets and purchasers; (5) the similarity of the advertising media used; (6) the defendant's intent; and (7) actual confusion." *Carnival Corp.*, 74 F. Supp. 2d at 1265. There are "four categories" of marks: generic; descriptive; suggestive; and "fictitious, arbitrary or fanciful." *See Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1540 (11th Cir. 1985) (citation omitted). The Eleventh Circuit has described the difference between the categories this way:

> The demarcation between each category is more blurred than it is definite. A term which suggests the basic nature of the service is generic. The term Milk Delivery is an example of a generic service mark for a hypothetical milk delivery service. A generic term is typically incapable of achieving service mark protection because it has no distinctiveness. A descriptive term merely identifies a characteristic or quality of a service. An example of a descriptive service mark might be BarnMilk. Because a descriptive service mark is not inherently distinctive, it may be protected only if it acquires a secondary meaning. The personal name component of a service mark such as Barney's to denote a milk delivery service is also considered not inherently distinctive and hence merely descriptive. However, if the personal name

> mark acquires secondary meaning, it is afforded the strength of an inherently distinctive mark. Marks which are descriptive of geographic location of the source of the service are treated in the same manner as personal name marks. A suggestive term suggests the characteristics of the service and requires an effort of the imagination by the consumer in order to be understood as descriptive of the service. Barn–Barn is an example of a suggestive service term. Because a suggestive service mark is inherently distinctive, no proof of secondary meaning is required for it to be protectable. An arbitrary or fanciful term bears no relationship to the service. Arbitrary and fanciful terms are also inherently distinctive, so they are protectable without proof of secondary meaning. Barnbarnfish is an example of an arbitrary or fanciful service mark.

*Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1522–23 (11th Cir. 1991) (cleaned up); *see also Laite*, 756 F.2d at 1540 (noting that suggestive marks are "comparatively weak" but "will be protected without proof of secondary meaning" and that fictitious/arbitrary/fanciful marks are "generally inherently distinctive" and therefore "strong" and "afforded the widest ambit of protection").

"Secondary meaning is the connection in the consumer's mind between the mark and the provider of the service." *Investacorp, Inc.*, 931 F.2d at 1525. "Absent consumer survey evidence," "four factors can be considered in determining whether a particular mark has acquired a secondary meaning: (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the plaintiff's business; and (4) the extent to which the public actually identifies the name with the plaintiff's service." *Id.* (cleaned up).

Actual confusion is "reported instances of individuals who have actually become confused about the source of the services because of the similarities between the parties' trademarks." *Popular Bank of Fla. v. Banco Popular de Puerto Rico*, 9 F. Supp. 2d 1347, 1360 (S.D. Fla. 1998). Plaintiff can show actual confusion in many ways, including with evidence of "consumer inquiries regarding possible affiliation between the parties," "attempts to purchase goods or services actually

offered by the other party," "misdirected correspondence such as bills or letters," and misdirected phone calls. *See id.* Plaintiffs can also offer "survey evidence" and witness testimony. *See Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 845 (11th Cir. 1983). "The strength of such evidence depends on the number of instances of confusion, the kinds of persons confused and the degree of confusion." *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 137 (11th Cir. 2022) (quotation marks omitted). The most important consideration is the type of person confused: if "consumers of the relevant product or service, especially the mark holder's customers," are confused, courts give that fact "substantial weight." *See id.* (quotation marks omitted).

"The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists. Rather, a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision. The appropriate weight to be given to each of these factors varies with the circumstances of the case." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1346 (11th Cir. 2012) (citations omitted). "Of these factors, the type of mark and the evidence of actual confusion are the most important in this circuit," *Dieter*, 880 F.2d at 326, but actual confusion "is obviously not a prerequisite to a finding of likelihood of confusion, as it is one of seven factors considered in the likelihood-of-confusion determination," *Wreal, LLC*, 38 F.4th at 137. "In reviewing the evidence, there are no set rules as to how much evidence of confusion is needed; rather, a district court must take into consideration the circumstances surrounding each particular case." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997) (quotation marks omitted).

9

**2.  Federal False Designation of Origin/Unfair Competition (15 U.S.C. § 1125(a))**

"Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition in interstate commerce, and forbids unfair trade practices involving infringement of trademarks, even in the absence of federal trademark registration." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (alteration adopted, quotation marks omitted). "Section 43(a) is remedial in nature and should be interpreted and applied broadly so as to effectuate its remedial purpose." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001).  "The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source." *Suntree Techs.*, 693 F.3d at 1346 (citation and emphasis omitted).  "Common law and statutory trademark infringements are merely specific aspects of unfair competition." *Planetary Motion, Inc.*, 261 F.3d at 1193–94 n.5.

"To state a claim for unfair competition and false designation of origin, a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it such that consumers were likely to confuse the two," *Brain Pharma, LLC v. Scalini*, 858 F. Supp. 2d 1349, 1355–56 (S.D. Fla. 2012) (quotation marks omitted), which are the same elements required "to prevail on [a] federal claim of trademark infringement," *Suntree Techs.*, 693 F.3d at 1346. *Cf. Chanel, Inc.*, 362 F. Supp. 3d at 1262 (explaining that the "test for liability for false designation of origin under 15 U.S.C. § 1125(a) is the same as for a trademark counterfeiting and infringement claim – i.e., whether the public is likely to be deceived or confused by the similarity of the marks at issue").  Because the "legal standard for unfair competition under both the Lanham Act and the common law has been held to be essentially the same as the standard for trademark infringement," courts "apply the same seven-

factor 'likelihood of confusion' test to claims brought under 15 U.S.C. § 1125(a) as well as infringement claims." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 91 F. Supp. 3d 1265, 1284–85 (S.D. Fla. 2015). A false designation of origin claim "proscribes the behavior of passing off or palming off, which occurs when a producer misrepresents his own goods or services as someone else's." *Custom Mfg.*, 508 F.3d at 647 (quotation marks omitted).

### 3. Florida Common Law Trademark Infringement

"Courts may use an analysis of federal infringement claims as a measuring stick in evaluating the merits of state law claims of unfair competition." *Planetary Motion, Inc.*, 261 F.3d at 1193 n.4. Indeed, "analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim." *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 802 (11th Cir. 2003); *see also Chanel, Inc.*, 362 F. Supp. 3d at 1263 ("The analysis of liability for Florida common law trademark infringement is the same as the analysis of liability for trademark infringement under § 32(a) of the Lanham Act."); *cf. Custom Mfg.*, 508 F.3d at 652 (noting that a plaintiff's "failure to establish a likelihood of confusion as to its Lanham Act claim also extinguishes its claim under Florida law").

### C. Forms of Relief Available in Trademark Cases

### 1. Permanent Injunction Standard

A district court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." *See* 15 U.S.C. § 1116(a). Indeed, injunctive relief "is the remedy of choice for trademark and unfair competition cases, since there is no

adequate remedy at law for the injury caused by a defendant's continuing infringement." *Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1509–10 (S.D. Fla. 1995) (quotation marks omitted).  In "ordinary trademark infringement actions complete injunctions against the infringing party are the order of the day.  The reason is simple: the public deserves not to be led astray by the use of inevitably confusing marks — even in cases in which more than one entity has a legal right to use the mark." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008) (alteration adopted, citation and quotation marks omitted).

"Under traditional equitable principles, a plaintiff seeking a permanent injunction must demonstrate (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction."  *Id.* at 1208.  In "trademark cases, a sufficiently strong showing of likelihood of confusion may by itself constitute a showing of a substantial threat of irreparable harm." *Chanel, Inc.*, 362 F. Supp. 3d at 1263 (alteration adopted, quotation marks omitted).  In this Circuit, courts apply a "presumption of irreparable harm once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim" because "infringement by its nature causes irreparable harm." *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1287 (S.D. Fla. 2010) (quotation marks omitted).  The same presumption applies when analyzing permanent injunctions, *id.* at 1287 n.4, because the "standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success," *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987).

"[E]ven in a default judgment setting, injunctive relief is available." *Chanel, Inc.*, 362 F.

Supp. 3d at 1263.  In fact, a defendant's "failure to respond or otherwise appear . . . makes it difficult for" a plaintiff "to prevent further infringement absent an injunction." *Id.*  If a court determines that an injunction is warranted, its "broad equity powers allow it to fashion" whatever kind of injunctive relief is "necessary to stop" a defendant's "infringing activities." *Id.* at 1264.

### 2.  Refusal of Trademark Application

Under 15 U.S.C. § 1119, courts have the authority to order the cancellation of a trademark registration and direct the USPTO to refuse a pending registration where appropriate.  Refusal of registration is appropriate when the applied-for mark "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark . . . previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive[.]" *See* 15 U.S.C. § 1052(d).  In order to successfully challenge the mark on confusingly similar grounds, the plaintiff must prove (1) that the defendant's mark "resembles" the plaintiff's marks, (2) that the plaintiff's marks were registered before the defendant's mark, and (3) that the defendant's mark is likely to cause confusion when used in connection with its services.  *See Royal Palm Properties, LLC v. Pink Palm Properties, LLC*, 950 F.3d 776, 789 (11th Cir. 2020).  To analyze the third factor, courts use the same eight factors under the likelihood-of-confusion test.  *Id.*

### 3.  Damages

Under 15 U.S.C. § 1117(a), once a plaintiff proves a violation of their trademark rights, whether through infringement of a registered mark, unfair competition under § 1125(a) or (d), or a willful violation under § 1125(c), they may recover the defendant's profits, the plaintiff's actual damages, and the costs of the action.  *See* 15 U.S.C. § 1117(a).  For profit recovery, the plaintiff need only show the defendant's gross sales.  *See id.*  The burden then shifts to the defendant to

prove any claimed deductions or expenses. *See id.* Furthermore, a court may award damages "as long as the record contains evidence allowing the court to ascertain damages from 'mathematical calculations' and 'detailed affidavits.'" *See Grand Havana Inc. v. Alchemist Distilleries Inc.*, No. 23-CV-21943-KMM, 2024 WL 2797381, at *3 (S.D. Fla. Jan. 12, 2024).

### 4. Attorneys Fees

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). While § 1117(a) does not define the term "exceptional," the Eleventh Circuit has explained that "to be an exceptional case under the Lanham Act requires only that a case stands out from others, either based on the strength of the litigating positions or the manner in which the case was litigated."[2] *See Tobinick v. Novella*, 884 F.3d 1110, 1118 (11th Cir. 2018) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014) (internal quotation marks omitted)). "A case will not qualify as exceptional under the Lanham Act merely because one side has zealously pursued or defended its claim, especially on an issue with no directly controlling precedent." *See id.* at 1119. Whether a particular case stands out from others is "to be left to the discretion of district courts, considering the totality of the circumstances." *See id.* at 1117.

### III.   DISCUSSION

As discussed above, Plaintiff seeks a final default judgment, damages in the form of Defendants' gross sales, attorney's fees, and injunctive relief. *See generally* ECF No. [66]. Because damages are only appropriate upon a showing that Defendants infringed Plaintiff's trademark rights, the Court must first determine whether Plaintiff is entitled to default judgment

---

[2] Plaintiff cites to caselaw indicating that "exceptional" as used in § 1117(a) is defined as "malicious, fraudulent, deliberate, and willful." *See* ECF No. [66] at 18 (citing *Grand Havana Inc.*, 2024 WL 2797381, at *5). But that caselaw — and thus, that definition — has since been abrogated. *See Tobinick*, 884 F.3d at 1117–18.

on its claims for trademark infringement and false designation of origin before considering the requested remedies.  *See* 15 U.S.C. § 1116(a); 15 U.S.C. § 1117(c); *Agad*, 911 F. Supp. at 1509–10

### A. Final Default Judgment

Under Rule 55 of the Federal Rules of Civil Procedure, default judgment involves a two-step process.  The Court entered default against Defendants on April 2, 2025, thereby satisfying the first step of the default judgment process.  *See* ECF No. [62]. The Court must now determine whether the second step is satisfied—whether the well-pleaded allegations in the Amended Complaint support a final judgment.  *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.  This requires a showing that the factual content of the Amended Complaint permits a reasonable inference of liability for trademark infringement or false designation of origin.  *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41.  To meet this threshold, the Amended Complaint must provide facts supporting each element of the claims asserted.

### 1. Federal Trademark Infringement (Counts I and II)

To prevail under § 1114, a plaintiff must establish: (1) ownership of a valid trademark; (2) priority of rights in the mark; (3) unauthorized use of the mark in commerce by the defendant; and (4) a likelihood of consumer confusion resulting from that use.  *See Carnival Corp.*, 74 F. Supp. 2d at 1264–65; *Chanel, Inc.*, 362 F. Supp. 3d at 1262.  Here, Plaintiff's well-supported allegations, which are deemed admitted due to Defendants' default, satisfy each element of this standard.  *See TracFone*, 196 F. Supp. 3d at 1298

First, Plaintiff owns multiple federally registered trademarks, including La Granja De Zenón  (registered on August 23, 2022), La Vaca Lola (registered on June 20, 2023), and Bartolito

(registered on October 10, 2023). *See* ECF No. [25] at ¶17; ECF No. [25-1]; ECF No. [25-2]; ECF No. [25-3]. These registrations with the USPTO are prima facie evidence of the validity of the marks and Plaintiff's ownership of them. *See* 15 U.S.C. § 1115(a). Additionally, Plaintiff has used these marks in interstate and foreign commerce since at least 2016 in connection with children's entertainment programming. *See* ECF No. [25] at ¶16.

Second, Plaintiff's "La Granja De Zenón" mark has priority over Defendants' confusingly similar counterfeit mark "La Granja En Vivo." As stated above, Plaintiff has continuously used the Mark in commerce since at least 2016, predating Defendants' launch of their live children's series in late 2023. *See* ECF No. [25] at ¶¶16, 25. *See PetMed Express, Inc.*, 336 F. Supp. 2d at 1218 (noting that a plaintiff's mark had priority because the plaintiff began using the mark before the defendant began using its competing mark). Furthermore, Defendants' own promotional material reflects that live performances of "La Granja En Vivo" took place in South Florida between July and September of 2024, providing further proof of Plaintiff's priority. *See* ECF No. [66] at 15.

Third, Defendants have used the confusingly similar "La Granja En Vivo" mark in commerce without Plaintiff's consent. *See* ECF No. [66] at 5. In late 2023, Defendants began producing and marketing live shows titled "La Granja En Vivo," which included references to Plaintiff's characters such as Bartolito, La Vaca Lola, and Zenón. *See* ECF No. [25] at ¶¶25–28. Promotional materials referred to the shows as the live version of the "YouTube musical phenomenon," a phrase that mirrors Plaintiff's branding and promotional language. *See* ECF No. [25] at ¶¶25–28. Defendants jointly promoted, organized, and participated in these performances. *See* ECF No. [25] at ¶¶25–28. Additionally, the Amended Complaint alleges, and Defendants are deemed to have admitted, that Defendants did so "without authorization" from

Plaintiff and that Defendants' use is "unlicensed" and "unauthorized."  *See* ECF No. [25] at ¶¶28, 34.

Fourth and finally, the similarities between Plaintiff's registered mark "La Granja De Zenón" and Defendants' use of the infringing mark "La Granja En Vivo" are likely to cause consumer confusion.  Looking at the factors that determine the likelihood of confusion, the Court finds that "La Granja De Zenón" mark falls into the suggestive category and has acquired secondary meaning, making it entitled to strong protection.  *See Laite*, 756 F.2d at 1540.  Suggestive marks require a consumer to use imagination or perception to connect the mark with the underlying product or service.  *See id*.  Here, the mark "La Granja De Zenón" does not directly describe a specific product or service but instead evokes a farm-themed children's entertainment series through imaginative association.  *See id.*  The use of a proper name, "Zenón," paired with the Spanish word for "farm," invites consumers to infer a thematic concept rather than plainly describing the content.  Moreover, Plaintiff has extensively used the Mark in commerce since 2016, investing hundreds of thousands of dollars in marketing and distributing its content across a wide range of platforms.  *See* ECF No. [25] at ¶¶21–22.  These promotional efforts have further cemented the Mark's association with Plaintiff in the minds of consumers, reinforcing its secondary meaning.  *See Investacorp, Inc.,* 931 F.2d at 1523.  Because "the type of mark" is one of the most important factors in the likelihood-of-confusion analysis, the fact that "La Granja De Zenón" qualifies as a stronger, inherently distinctive mark weighs heavily in favor of finding a likelihood of confusion.  *Dieter*, 880 F.2d at 326.

Furthermore, the majority of the remaining factors also support that conclusion, including the similarity of the marks, the similarity of products, the retail channels and consumer bases, the types of advertising media used, and the Defendants' intent.  *See Carnival Corp.*, 74 F. Supp. 2d

at 1265.  Starting with the similarity of the marks, the "La Granja En Vivo" mark that Defendants used is highly similar in both appearance and connotation to Plaintiff's registered mark "La Granja De Zenón."  *Compare* ECF No. [25] at 9, *with* ECF No. [25] at 10.  Both marks begin with the dominant phrase "La Granja," which translates to "the farm" in Spanish, and is the central identifier in Plaintiff's branding.  *Compare* ECF No. [25] at 9, *with* ECF No. [25] at 10.  The phrase "En Vivo," meaning "live," implies a live version of an already familiar series — creating a direct connection in the minds of consumers to Plaintiff's existing "Granja" series.  *See* ECF No. [25] at ¶25.  Defendants' choice of mark not only mimics Plaintiff's naming structure but also uses it in connection with identical characters and a format nearly indistinguishable from Plaintiff's online shows.  *See* ECF No. [25] at ¶28.  This visual and contextual overlap increases the risk that consumers will mistakenly believe Defendants' live shows are affiliated with or endorsed by Plaintiff.  *See* ECF No. [25] at ¶¶ 25–30; ECF No. [66] at 7–10.

Furthermore, both Plaintiff's and Defendants' products are children's musical entertainment shows featuring the same core characters.  *See* ECF No. [25] at ¶28.  Defendants' use of Plaintiff's characters in their performances directly overlaps with Plaintiff's original content and services.  *See* ECF No. [25] at ¶28.  This functional equivalence makes confusion all the more likely.  *See* ECF No. [25] at ¶28.  Additionally, the target audience, families with children, are virtually identical.  *See* ECF No. [66] at 7.  This further supports the likelihood that consumers would believe the two services are related.  Defendants promoted their shows using similar language, including references to the "YouTube musical phenomenon," which mimics Plaintiff's own branding.  *See* ECF No. [25] at ¶26.  This deliberate mirroring in advertising increases the chance that consumers will believe the services are connected.  *See* ECF No. [66] at 8.  Finally, the Amended Complaint establishes that Defendants knowingly used Plaintiff's character names

and similar branding, despite having no license or authorization to do so.  This supports an inference of intent to capitalize off of Plaintiff's success.  *See* ECF No. [25] at ¶¶ 27–28; ECF No. [66] at 7–8.

Although Plaintiff has not established that actual confusion occurred, the Court may still find that a likelihood of confusion exists.  *See Wreal, LLC*, 38 F.4th at 137; *Suntree Techs., Inc.*, 693 F.3d at 1346.  Overall, the six factors supporting Plaintiff outweigh the single factor favoring Defendant.  In light of the record, even without direct evidence of actual confusion, there is a strong likelihood that Defendant's use of the "La Granja En Vivo" mark would mislead consumers.  *See Carnival Corp.*, 74 F. Supp. 2d at 1265; *Suntree Techs., Inc.*, 693 F.3d at 1346; *Longhorn Steaks, Inc.*, 122 F.3d at 138.  Because Plaintiff has established all four required elements for trademark infringement under § 1114, it has presented a plausible claim for relief.  *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41.  Accordingly, Plaintiff is entitled to final default judgment on Counts I and II.  *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

Because Plaintiff has met the necessary requirements for trademark infringement under § 1114, I respectfully **RECOMMEND** that final default judgment **BE ENTERED** in Plaintiff's favor on Counts I and II.  *See* Fed. R. Civ. P. 55 (b)(2); *Surtain*, 789 F.3d at 1244.

### 2.  Federal Unfair Competition and False Designation of Origin (Counts III and IV)

To prevail under § 1125(a), Plaintiff must demonstrate: (1) that it holds enforceable rights in the trademarks at issue, and (2) that Defendants used those marks without authorization in a manner likely to cause consumer confusion.  *See Brain Pharma*, 858 F. Supp. 2d at 1355–56.  Although framed in two parts rather than four, these elements mirror those required to establish a trademark infringement claim under § 1114.  *See Suntree Techs.*, 693 F.3d at 1346; *Chanel, Inc.*,

362 F. Supp. 3d at 1262; *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1284–85.  The primary distinction is that § 1125(a) also protects unregistered marks, whereas § 1114 does not.  *See Custom Mfg.*, 508 F.3d at 647.

However, this difference does not affect the analysis of likelihood of confusion, as the legal standards for unfair competition and trademark infringement are essentially the same.  *See Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1284–85.  As such, the reasoning set forth in the Court's analysis of Counts I and II is equally applicable to Counts III and IV.  *See supra* Section III.A.1.  Plaintiff has shown that it possesses valid trademark rights and that Defendants made unauthorized use of those marks in a way that is likely to mislead consumers.  *See Brain Pharma*, 858 F. Supp. 2d at 1355–56.  Accordingly, Plaintiff has met the standard for relief under § 1125(a).

Plaintiff has adequately pleaded both elements required to establish liability under § 1125(a) for unfair competition and false designation of origin.  The allegations, taken as true due to Defendants' default, support a plausible claim for relief.  *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41.  Having done so, Plaintiff is entitled to final default judgment on Counts III and IV.  *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

Because Plaintiff has met the necessary requirements for false designation of origin under § 1125(a), I respectfully **RECOMMEND** that final default judgment **BE ENTERED** in Plaintiff's favor on Counts III and IV.  *See* Fed. R. Civ. P. 55 (b)(2); *Surtain*, 789 F.3d at 1244.

### 3.  Florida Common Law Trademark Infringement (Counts V and VI)

Courts apply the same likelihood-of-confusion analysis to federal common law trademark infringement claims as they do to claims under § 1114 and § 1125(a).  *See Suntree Techs.*, 693 F.3d at 1346.  Because the legal standards are materially identical, the analysis supporting liability

for Counts I and II applies equally to Plaintiff's common law trademark infringement claim. *See Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1284–85. Accordingly, for the same reasons discussed above, Plaintiff has also stated a plausible claim for relief on Counts V and VI. *See Iqbal*, 556 U.S. at 678. Accordingly, I respectfully **RECOMMEND** that final default judgment **BE ENTERED** in Plaintiff's favor on Counts V and VI. *See* Fed. R. Civ. P. 55 (b)(2); *Surtain*, 789 F.3d at 1244.

### 4. Florida Common Law Unfair Competition (Counts VII and VIII)

Courts apply the same analysis to evaluate Florida common law unfair competition claims as they do to evaluate federal trademark infringement claims. *See Suntree Techs.*, 693 F.3d at 1346. Thus, the Court's findings in its analysis of Counts I and II also apply to Counts VII and VIII. *See supra* Section III.A.1. Since Plaintiff has satisfied all elements of federal trademark infringement, the Court finds that Plaintiff has also met the standard for its Florida common law unfair competition claims. *See Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1284–85.

Having met the requirements for its Florida common law unfair competition claim, Plaintiff has stated a claim for relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678. I respectfully **RECOMMEND** that final default judgment **BE ENTERED** in Plaintiff's favor on Counts VII and VIII. *See* Fed. R. Civ. P. 55 (b)(2); *Surtain*, 789 F.3d at 1244.

### 5. Refusal of Trademark Application (Count IX)

Section 1119 of the Lanham Act provides courts with authority to order the cancellation of a trademark registration and to direct the Patent and Trademark Office to refuse a pending registration where appropriate. *See* 15 U.S.C. § 1119. Refusal of registration is appropriate when the applied-for mark "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark . . . previously used in the United States by another

and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive[.]" *See* 15 U.S.C. § 1052(d). To successfully challenge the mark on confusingly similar grounds, the plaintiff must prove (1) that the defendant's mark "resembles" the plaintiff's marks, (2) that the plaintiff's marks were registered before the defendant's mark, and (3) that the defendant's mark is likely to cause confusion when used in connection with the defendant's services. *See Pink Palm*, 950 F.3d at 788. When analyzing the third factor, courts consider the same eight factors used to determine whether a likelihood of confusion exists. *Id.* at 789.

Here, Plaintiff meets all three requirements. First, the mark that Crom seeks to register, "La Granja En Vivo", bears a strong resemblance to Plaintiff's registered Mark, "La Granja De Zenón." *Compare* ECF No. [25] at 9, *with* ECF No. [25] at 10. Both marks begin with the identical phrase "La Granja," and both are used in connection with live children's programming and musical performances featuring the same characters, such as Bartolito, La Vaca Lola, and Zenón. *See* ECF No. [25] at ¶¶ 25–28; ECF No. [66] at 7–9.

Second, Plaintiff's Marks were registered prior to Crom submitting its trademark application. Plaintiff registered "La Granja De Zenón" on August 23, 2022 and began using its marks in commerce as early as 2016, long before Defendant began promoting or performing its live show in late 2023. *See* ECF No. [25] at ¶¶ 13–14, 20–23; ECF No. [66] at 5–6. Additionally, Crom filed its trademark application for "La Granja En Vivo" on February 28, 2024, nearly two years after Plaintiff registered "La Granja De Zenón." *See* ECF No. [25-4].

Third, Plaintiff has sufficiently demonstrated a likelihood of confusion using the relevant multi-factor analysis. *See Pink Palm,* 950 F.3d at 789. The marks are highly similar in structure and appearance; both involve similar goods and services — namely, musical entertainment for

children — and target the same consumer base.  *Compare* ECF No. [25] at 9, *with* ECF No. [25] at 10.  Moreover, Defendants promoted their show using similar branding language, referring to it as the "YouTube musical phenomenon," which closely echoes Plaintiff's own promotional descriptions.  *See* ECF No. [25] at ¶26; ECF No. [66] at 7.

As a result, Plaintiff has met the standard for cancellation or refusal of registration under §§ 1052(d) and 1119.  I, therefore, respectfully **RECOMMEND** that the Court **ENTER** default judgment on Count IX and **GRANT** Plaintiff's request to cancel or refuse registration of the "La Granja En Vivo" mark.  *See Pink Palm,* 950 F.3d at 789.

## B.  Permanent Injunction

Because Plaintiff has established entitlement to final default judgment on Counts I through VIII, *see supra* Section III.A, the Court must now determine whether a permanent injunction is an appropriate remedy under 15 U.S.C. § 1116(a).  *See* 15 U.S.C. § 1116(a).  Injunctive relief is commonly granted in the default judgment context, especially in trademark cases, where a defendant's failure to appear leaves the plaintiff with limited means to prevent ongoing infringement.  *See Chanel, Inc.*, 362 F. Supp. 3d at 1263; *Agad*, 911 F. Supp. at 1509–10.

To obtain a permanent injunction, Plaintiff must show (1) irreparable harm, (2) the inadequacy of legal remedies such as monetary damages, (3) that the balance of hardships favors injunctive relief, and (4) that the injunction would not disserve the public interest.  *See Angel Flight of Ga., Inc.*, 522 F.3d at 1208.  Because Plaintiff has succeeded on its trademark infringement claim, irreparable harm is presumed, satisfying the first element.  *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1287 & n.4; *Amoco Prod. Co.*, 480 U.S. at 546 n.12.  Further, courts in this District have consistently held that continued trademark infringement cannot be adequately remedied through monetary relief alone, satisfying the second element.  *See Agad*, 911 F. Supp. at 1509–10.

As to the third element, the balance of hardships weighs in favor of granting injunctive relief.  Plaintiff has invested significant resources into developing, marketing, and protecting its trademarks and associated goodwill.  *See* ECF No. [25] at ¶¶20–23; ECF No. [66] at 6.  Continued infringement by Defendants, who have no lawful right to use the marks, threatens to undermine that investment and cause ongoing damage to Plaintiff's reputation. S*ee Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1287.  By contrast, enjoining Defendants from using marks to which they have no valid claim imposes no legitimate hardship on them.  *See id.* at 1288.  Thus, the equities clearly favor Plaintiff.  *See id.*

Finally, a permanent injunction would serve the public interest.  The Eleventh Circuit has emphasized that the public has a strong interest in avoiding unnecessary confusion and in being protected from misleading or deceptively similar marks.  *See Angel Flight of Ga., Inc.*, 522 F.3d at 1209.  It has also recognized that a complete injunction is appropriate in ordinary trademark infringement actions because the public deserves not to be misled.  *See id*.  Courts in this District have similarly concluded that the public holds a paramount interest in not being confused by infringing conduct.  *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1288.  Applying those principles here, enjoining Defendants from continuing to use marks that closely resemble Plaintiff's registered trademarks, particularly in connection with performances that incorporate the same characters and themes, will prevent ongoing consumer confusion.  *See* ECF No. [25] at ¶¶20–23.  Thus, the fourth element is satisfied, and a permanent injunction is warranted.

Plaintiff has satisfied all four requirements of the permanent injunction test.  *See Angel Flight of Ga., Inc.*, 522 F.3d at 1208.  Accordingly, I **RECOMMEND** that a permanent injunction **BE ISSUED** against Defendants prohibiting the use of the "La Granja En Vivo" mark.  *See* 15 U.S.C. § 1116(a); *Chanel, Inc.*, 362 F. Supp. 3d at 1264 (noting that a court's broad equity powers

24

allow it to fashion whatever kind of injunctive relief is necessary to stop a defendant's infringing activities).

### D. Damages

Under 15 U.S.C. § 1117(a), once a plaintiff proves a violation of their trademark rights, whether through infringement of a registered mark, unfair competition under § 1125(a) or (d), or a willful violation under § 1125(c), they may recover the defendant's profits, the plaintiff's actual damages, and the costs of the action. *See* 15 U.S.C. § 1117(a). For profit recovery, the plaintiff need only show the defendant's gross sales. *See id.* The burden then shifts to the defendant to prove any claimed deductions or expenses. *See id.* Furthermore, a court may award damages "as long as the record contains evidence allowing the court to ascertain damages from 'mathematical calculations' and 'detailed affidavits.'" *Grand Havana*, 2024 WL 2797381, at *3.

Plaintiff has established that Defendants violated its trademark rights through both infringement of federally registered marks and unfair competition. As a result, Plaintiff is entitled to recover monetary relief under 15 U.S.C. § 1117(a), namely, Defendants' profits. *See* 15 U.S.C. § 1117(a).

Because Defendants were defaulted, they have provided no evidence disputing Plaintiff's allegations or contesting the measure of damages. *See* ECF No. [66] at 16. Before default was entered, Defendants produced promotional materials revealing that fourteen live performances of "La Granja En Vivo" were held in South Florida between July and September of 2025. *See* ECF No. [66] at 15; ECF No. [65] at 2. Defendants provided two documents that reflect gross profits from two separate "La Granja En Vivo" performances. *See* ECF No. [66] at 16. According to these records, Defendants earned $8,840.00 from the "North Miami 2" performance and $6,600.00 from a performance labeled "Show # 7." *See* ECF No. [66] at 16; ECF No. [65] at 2-3. Although

Plaintiff was unable to conduct full discovery before Defendants ceased participating in the litigation, the available records indicate an average gross profit of $7,720.00 per show based on these two performances.  *See* ECF No. [66] at 16; ECF No. [65] at 3.

Accordingly, Plaintiff asks the Court to rely on the average gross profit reflected in Defendants' own documents to determine the appropriate amount of profit to be disgorged.  *See* ECF No. [66] at 16.  Based on those records, Plaintiff seeks damages in the amount of $108,080.00, calculated by multiplying the average gross profit of $7,720.00 by the 14 performances of "La Granja En Vivo."  *See* ECF No. [66] at 16.  The Court agrees with Plaintiff that this figure represents the most reasonable and accurate estimate available given the limited production from Defendants before their counsel withdrew.  *See* ECF No. [66] at 17.  Because Defendants have not provided any evidence to dispute this calculation or to justify any deductions, I respectfully **RECOMMEND** that Plaintiff **BE AWARDED** $108,080.00 against Defendants as their damages for trademark infringement.  *See* ECF No. [66] at 16.

### E.  Attorney's Fees

Under 15 U.S.C. § 1117(a) "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  "[T]o be an 'exceptional case' under the Lanham act requires only that a case 'stands out from others,' either based on the strength of the litigating positions or the manner in which the case was litigated."  *Tobinick,* 884 F.3d at 1118 (quoting *Octane*, 572 U.S. at 554).  The ultimate decision on whether a case stands out as exceptional is left to the discretion of the district courts, considering the totality of the circumstances.  *See id.* at 1117 (citing *Octane*, 572 U.S. at 554).  This case is not an exceptional case based on the strength of the litigating positions or the manner in which the case was litigated.

Unlike *Tobinick*, this case does not present the type of conduct or litigation history that

would support a finding of exceptionality under 15 U.S.C. § 1117(a).  In *Tobinick*, the district court found the case exceptional because, after repeated adverse rulings on the merits, the plaintiff continued to multiply the proceedings by seeking to add new parties and claims, advancing baseless allegations of perjury, and filing numerous motions despite clear guidance from the court. *Id.* at 1118. The Eleventh Circuit affirmed that this conduct — persisting in meritless claims, escalating filings after unfavorable rulings, and attempting to relitigate settled issues — made the case "stand out" as "not run-of-the-mill." *Id.* at 1118-19.  The appellate court also highlighted how the procedural history showed unnecessary prolonging of the case and abusive litigation tactics. *Id.*

By contrast, nothing in the record here suggests similar conduct.  This case does not reflect repeated adverse rulings ignored by Defendants nor efforts to expand the litigation improperly by adding parties or filing baseless motions.  Here, Defendants engaged in limited litigation and discovery before their counsel withdrew and the Court subsequently defaulted them.  Defendants have not engaged in motion practice, much less any frivolous motion pratice, have not otherwise unnecessarily multiplied the proceedings, and there is no indication of abusive litigation tactics akin to those in *Tobinick*.

Moreover, as *Tobinick* itself recognizes, a case will not qualify as exceptional merely because a party zealously pursued its claims or litigated issues on which precedent is unsettled. *See Tobinick*, 884 F.3d at 1119.  Here, there is no evidence of objectively unreasonable legal positions or litigation misconduct by Defendant that would set this case apart from typical trademark disputes.  The claims appear to have been pursued based on factual allegations and legal theories common in Lanham Act litigation, and nothing suggests the case ballooned procedurally in an abusive or extraordinary way or that this was anything other than a run-of-the-mill case.

Considering the totality of the circumstances, this case lacks the hallmarks of exceptionality present in *Tobinick*; therefore, it would not be appropriate to award attorney's fees under § 1117(a), so I respectfully **RECOMMEND** that Plaintiff's request for attorney's fees be **DENIED**.

## IV.    CONCLUSION

Accordingly, I respectfully **RECOMMEND** that Plaintiff's Motion for Entry of Final Judgment After Default Against Defendants, **ECF No. [66]**, be **GRANTED in part and DENIED in part** as follows:

1. Final Default Judgment **BE ENTERED** in favor of Plaintiff and against Defendants as to all counts of the Amended Complaint, ECF No. [25], *see* Fed. R. Civ. P. 55 and 58;

2. Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in concert with them be **PERMANENTLY ENJOINED AND RESTRAINED**, *see* Fed. R. Civ. P. 65, from directly or indirectly making any use, related to the business of creating and providing educational and entertainment services and products for children, including live, on-line, and television programs featuring lively music and/or causing, aiding, abetting or contributing to the actions of others in using in relation to such products/services and for any other service for which Plaintiff's Marks are registered in the United States, in particular:

    i. The infringing trademark "La Granja En Vivo" and any other trademark that copies, imitates, or is confusingly similar to Plaintiff's Marks;

    ii. Any advertisements or promotional materials or other items that

CASE NO. 24-CV-22839-MOORE/Elfenbein

are labeled with or contain trademarks prohibited in i. above;

    iii.  From directly or indirectly infringing Plaintiff's Marks;

    iv.  From unfairly competing with Plaintiff; and

    v.  From falsely claiming any affiliation with Plaintiff.

3. Plaintiff's request that the USPTO refuse and reject Crom's trademark application for "La Granja En Vivo" (U.S. Application No. 98409771) **BE GRANTED**;

4. Plaintiff **BE AWARDED $108,080.00** in damages, representing Defendants' gross profits pursuant to 15 U.S.C. § 1117(a); and

5. Plaintiff's request for attorney's fees be **DENIED**

Pursuant to Local Magistrate Rule 4(b), the Parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable K. Michael Moore, United States District Judge.  Failure to timely file objections shall bar the Parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the Parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on September 8, 2025.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc:

All Counsel of Record

29